```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
In re:                                                          :
                                                                :    Chapter 7
ISAAC SCHINAZI,                                                 :    Case No.: 06-10226 (BRL)
                                                                :
                               Debtor.                          :
----------------------------------------------------------------X
SAMI TAMMAN and JACQUELINE TAMMAN,                              :
                                                                :
                               Plaintiffs,                      :    Adv. Pro. No.: 06-01782 (BRL)
                                                                :
              -against-                                         :
                                                                :
ISAAC SCHINAZI, SONIA SCHINAZI, and                             :
BRAUNER BARON ROSENZWEIG & KLIEN, LLP,                          :
                                                                :
                               Defendants.                      :
----------------------------------------------------------------X
```

## COURT'S POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

The following constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure. Pursuant to the Joint Pre-Trial Statement (Dkt. No. 61), a trial was held on November 15, 2010 at 10:00 a.m. to determine whether an order should be entered declaring the amounts represented by the judgment entered on September 7, 2005 (the "Judgment") by the United States District Court for the Southern District of New York against the debtor Isaac Schinazi ("Debtor" or "Schinazi") in the action titled *Tamman v. Schinazi*, 00 CV 9404 (the "District Court Action") to be non-dischargeable pursuant to section 523(a)(2)(A) of title 11 of the United States Code (the "Code").

In the District Court Action, the jury returned a unanimous verdict in favor of the Tammans, finding that (i) Schinazi entered into a contract with the Tammans, (ii) the contract obligated Schinazi to return the monies transferred by the Tammans, plus interest, (iii) Schinazi breached the contract by failing to return the Tammans' monies, and (iv) Schinazi's breach of contract caused the Tammans to sustain damages in the amount of $1,799, 327. The jury's verdict substantially exceeded the damages requested by the Tammans.

Two witnesses were called at trial before this Court: plaintiff Sami Tamman and defendant Schinazi. Having considered the evidence, testimonial and documentary, including trial Exhibits A through W, as well as Plaintiffs' and Debtor-Defendants' Post-Trial Findings of Fact and Conclusions of Law, and keeping in mind that a court should not blindly accept findings of fact and conclusions of law proferred by the parties, *see St. Clare's Hosp. and Health Ctr. v. Ins. Co. of North Am., (In re St. Clare's Hosp. and Health Ctr.)*, 934 F.2d 15 (2d Cir. 1991) (citing *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656 (1964)), and having conducted an independent analysis of the law and the facts, this Court makes the following Findings of Fact and Conclusions of Law:

# FINDINGS OF FACTS

## Procedural History

1.  On February 9, 2006, the Debtor filed a voluntary petition for relief under chapter 7 of the Code with this Court, and an Order for Relief was simultaneously entered.

2.  David R. Kittay was appointed as chapter 7 trustee of the Debtor's estate.

3.  On October 6, 2006, the Tammans commenced this adversary proceeding against the Debtor by filing a complaint (Joint Trial Exhibit A) seeking a determination that the amounts represented by the Judgment are excepted from discharge pursuant to, *inter alia*, section 523(a)(2)(A) of the Code.

4.  Issue was joined on November 7, 2006 by the filing and service of the Debtor's Amended Answer to the Complaint (Joint Trial Exhibit B).

## The Relationship Between the Parties

5.  Schinazi and Sami Tamman are related by marriage, and they consider themselves cousins. See Joint Pretrial Order entered Nov. 16, 2010, Section V. Stipulated Facts ("JPO Stipulated Facts") ¶ 1. Schinazi is five months older than Sami Tamman. See Trial Exh. K at 3:22-24.

6.  As teenagers in the 1970s, Schinazi and Sami Tamman socialized together in Rio de Janeiro. See JPO Stipulated Facts ¶ 2.

7.  Schinazi and the Tammans continued to socialize thereafter. See JPO Stipulated Facts ¶ 3.

8.  Schinazi's father, Samuele Schinazi, was the president of B'nai Brith and the head of the close-knit Sephardic Jewish Community in Rio de Janeiro. See JPO Stipulated Facts ¶ 4; Trial Exh. K at 4:12-23; Trial AM Tr. at 10:11-12.

## Schinazi's Dealings with the Tammans Regarding the
## Tammans' Account with Schinazi's Father's Currency Exchange Business

9.  Samuele Schinazi operated currency exchange business in Brazil. See JPO Stipulated Facts ¶ 5.

10. Schinazi worked in Brazil for his father's currency exchange business from 1982 through 1990. See JPO Stipulated Facts ¶ 5.

11. Schinazi continued to perform services for his father's currency exchange business after he moved from Brazil to New York in 1990. See JPO Stipulated Facts ¶ 6.

12. Schinazi claimed he did not receive any compensation for working or performing services for his father's currency exchange business. See Trial PM Tr. at 53:4-7 (Schinazi "never got a salary" while working in Brazil for his father's currency exchange business); Trial PM Tr. at 60:24-61:1 (Schinazi "never got a commission on anything" while performing services for his father's currency exchange business after he moved to New York).

13. Schinazi did, however, receive substantial monies from his father. See Trial PM Tr. at 61:24-62:1 ("Well, whenever my father -- uh, whenever – if I needed money for something, my father would help me out."). Schinazi's father paid Schinazi's "expenses" during the time Schinazi worked in Brazil for his father's currency exchange business from 1982 through 1990. See Trial PM Tr. at 53:4-7 (Schinazi testified that his "father would pay my – my – my bills and everything" while he was working in Brazil for his father's currency exchange business). Thereafter, Schinazi's father provided financial support to Schinazi: Schinazi's father paid some of Schinazi's bills, Schinazi's father provided Schinazi with the $200,000 down payment for the purchase of house in Mamaroneck, and Schinazi's father provided Schinazi with about $30,000 a year. See Trial PM Tr. at 62:1-9 (Schinazi testifies that his father gave him $200,000 to buy his house in Mamaroneck); Trial PM Tr. at 62:10-20 (Schinazi testified that in the late 1990's and early 2000's, "he [his father] would help me . . . And so I needed to pay expenses, I would ask my father, he would help me."); Trial PM 63:13-64:2 (Schinazi admits his father provided him with about $30,000 a year).

14. The Tammans had an account with the Schinazi's father's currency exchange business from the 1980s through at least 1998. The Tammans used this account to access local Brazilian currency and pay expenses while visiting Brazil from their residence in Switzerland. See JPO Stipulated Facts ¶ 7.

15. The Tammans' account with Schinazi's father's currency exchange business did not pay any interest. See Trial AM Tr. at 84:11-14 ("He had an account with my father where he deposited money, um, for his father to use for his father in law. It was like a, a non interest account, you now, just like a, money that was with my father doing nothing.").

16. Schinazi had dealings with Sami Tamman in connection with the Tammans' account with Schinazi's father's currency exchange business both before and after Schinazi moved to New York in 1990. See JPO Stipulated Facts ¶ 8. When Sami Tamman made deposits after Schinazi moved to New York in 1990, Schinazi instructed Sami Tamman where to send the money, and Sami Tamman transferred money pursuant to Schinazi's instructions. See Trial Exh. K at 8:14-21.

## Circumstances Leading to the New Account

17. Sami Tamman learned in 1997 that his in-laws in Brazil had financial difficulties. See Trial Exh. K at 8:22-9:8.

18. Sami Tamman notified Schinazi and Sami Tamman began to transfer money to Schinazi to pay his in-laws' debts. See Trial AM Tr. at 89:6-9; Trial Exh. K at 9:7-23.

19. Schinazi instructed Sami Tamman to transfer money to an account in New York. See Trial Exh. K at 10:2-3. After each transfer, Sami Tamman would call Schinazi to confirm that Schinazi had received the money. See Trial Exh. K at 10:3-4. Schinazi would then instruct his office in Rio de Janiero to make the necessary payments. See Trial Exh. K at 10:8-10.

20. Schinazi told Sami Tamman that the payments could be made quicker in Brazil if Tamman made a larger deposit and maintained a balance with him. See Trial Exh. K at 10:15-17.

21. At this time, Sami Tamman intended to purchase a property in Brazil for the benefit of his in-laws. See Trial AM Tr. at 5:14-16; Trial AM Tr. at 86:21-23; Trial PM Tr. at 3:20-24; Trial Exh. D at 6:20-7:10; Trial Exh. D at 27:13-28:2; Trial Exh. K at 40:1-4.

3

**Schinazi's Promises Regarding the New Account**

22.  In early 1998, Schinazi and Sami Tamman had a conversation during which Schinazi made a proposal about a new account.  See Trial AM Tr. at 89:6-18; Trial Exh. J at 9:16-23.  Sami Tamman could not recall precisely when Schinazi described to him the terms of the new account, but it was well before May 8, 1998 when Schinazi later provided Tamman with a receipt.  See Trial PM Tr. at 4:3-22; Trial PM Tr. at 6:3-7.

23.  During this conversation, Schinazi described the terms of the new account.  See Trial AM Tr. at 89:11-24; Trial Exh. J at 9:24-10:16; Trial Exh. J at 13:16-14:22.

24.  Schinazi told Sami Tamman that the balance maintained in the new account would appreciate.  See Trial AM Tr. at 127:4-9; Trial Exh. J at 10:5-7.  Schinazi testified that the monies provided by the Tammans would appreciate by a fixed percentage each month.  See Trial Exh. J at 10:5-7; Trial Exh. O at 2; Trial Exh. H at ¶ 2(ii).  Sami Tamman testified that Schinazi promised to make the Tammans "'happy'" with a "'good return.'"  See Trial AM Tr. at 7:17-21; Trial PM Tr. at 4:3-6; Trial Exh. O at 7.

25.  Schinazi told Sami Tamman that the Tammans would do better with the account because the money in the Tammans' account with Schinazi's father's currency exchange business did not appreciate.  See Trial AM Tr. at 84:11-14; Trial AM Tr. at 86:23-87:3.

26.  Schinazi told Sami Tamman that he and his father would invest the Tammans' money.  See Trial Exh. J at 10:8-10 ("Q:  You told Mr. Tamman that you and your father are going to invest the money, correct?  A:  We are going to invest his money, of course."); Trial Exh. C at 178:21-22 ("Q:  What was the money then to be?  A:  To be invested by us.").

27.  Schinazi told Sami Tamman that that he and his father would keep any investment returns greater than the appreciation promised to the Tammans.  See Trial Exh. J at 13:10-14:15.

28.  Schinazi told Sami Tamman that Schinazi's father would bear the risk for losses on investments made with the Tammans' money.  See Trial PM Tr. at 20:19-24; Trial Exh. C at 199:6-200:20 (Schinazi agrees that he told the Tammans that his father would bear the risk of investment losses with the Tammans' monies).

29.  Schinazi told Sami Tamman that the Tammans' principal was guaranteed, as the Tammans would not bear the risk of any losses on the investments made with their money.  See Trial AM Tr. at 34:11-22; Trial PM Tr. at 5:17-7:2; Trial Exh. C at 199:6-200:20; Trial Exh. O at 2 ("Defendant told plaintiffs that their principal would be guaranteed . . . Defendant acknowledges making these statements . . ."); Trial Exh. H at ¶ 2(i) (Schinazi admits he told the Tammans that their principal would be guaranteed).

30.  Schinazi told Sami Tamman that the Tammans' money would be returned upon a request to him, and that he would be responsible for returning the Tammans' money.  See Trial AM Tr. at 7:22-25; Trial AM Tr. at 128:16-23 ("Q:  So, before Mr. Tamman started putting money into this account, according to your testimony in 2005, you told him, um, that if he wanted to withdraw the money, all he had to do was ask?  A: Yes, of course. That's what it says here.  A – again.  now I don't recall; but I see that I said that.  So, I, I don't have any problem, uh, confirming that . . ."); Trial AM Tr. at 101:4-9 ("Q: [D]uring your discussions with Sami Tamman, before Sami Tamman, started putting money into this account, did you intend to be personally responsible for returning Sami Tamman's money?  A:  What I said was that I was fully responsible for the money . . ."); Trial PM Tr. at 3:20-4:6; Trial PM Tr. at 5:17-25; Trial PM Tr. at 6:16-19; Trial Exh. J at

4

14:16-18; Trial Exh. O at 2; Trial Exh. H ¶ 2(iii) (Schinazi admits that he "told the Tammans that . . . the money would be returned within weeks of a demand to [him]."); Trial Exh. C at 107:15-19.

### Schinazi's Intention When Making Promises Regarding the New Account

31. Schinazi claims he was acting as an agent for his father when he had this conversation with Sami Tamman about the new account. See Trial AM Tr. at 90:12-14.

32. Despite his understanding that he was acting as his father's agent, Schinazi did not tell Sami Tamman that he was acting as his father's agent. See Trial AM Tr. at 8:10-12; Trial AM Tr. at 8:22-25; Trial AM Tr. at 108:8-14; Trial PM Tr. at 6:11-15; Trial Exh. J at 47:23-48:8.

33. Schinazi's intention in making the foregoing representations to Sami Tamman was to induce Sami Tamman to enter into this new transaction and transfer monies to the new account. See Trial AM Tr. at 99:7-100:11; Trial PM Tr. at 60:5-7; Trial Exh. J at 9:16-23 (Schinazi acknowledges he told the Tammans the terms of transaction because "You are always trying to find new investors"); Trial Exh. C at 192:16-25 ("Q: When you had this conversation with Mr. Tamman on the telephone, were you trying to encourage Mr. Tamman to invest money with your father?  A:  Yes, of course.  Why not?"); Trial Exh. O at 2 ("It is undisputed that defendant encouraged plaintiffs to place funds with defendant's father."); Trial Exh. H at ¶ 1 (Schinazi admits he "encouraged the Tammans to place funds with his father.").

34. Schinazi knew Sami Tamman wanted Schinazi to be personally responsible for returning the Tammans' money. See Trial Exh. K at 38:10-16.

35. Despite making the promise to Sami Tamman that he would be personally responsible for returning the Tammans' money, Schinazi never intended to be personally responsible for returning the Tammans' money. See Trial AM Tr. at 101:4-25; Trial AM Tr. at 103:4-15; Trial Exh. Q at ¶ 29 (admitting that Schinazi never intended to be personally responsible for returning the Tammans' monies); Trial Exh. S ¶ 10 ("I was never personally responsible for the repayment or return of the funds transferred by the Plaintiffs.").

36. When Schinazi told Sami Tamman that he would be personally responsible for returning the Tammans' money, Schinazi did not tell Sami Tamman what he really thought, i.e., that he did not intend be personally responsible for returning the Tammans' money. See Trial AM Tr. at 128:25-129:6; Trial AM Tr. at 118:11-20.

37. When Schinazi told Sami Tamman that the Tammans' principal would be guaranteed, Schinazi did not have the intention of guaranteeing the Tammans' principal, i.e., he did not even think about it. See Trial AM Tr. at 119:16-120:3; Trial AM Tr. at 126:7-17; Trial Exh. J at 10:25-11:3; Trial Exh. J at 69:11-15; Trial Exh. J at 73:9-12; Trial Exh. O at 1, Trial Exh. H at ¶ 14.

### The Tammans' Reliance

38. After Schinazi described the terms of the new account, Sami Tamman agreed with Schinazi's proposal and transferred monies to the new account. See Trial Exh. J at 14:19-22.

5

39. The Tammans relied on Schinazi's promises, including the promises that Schinazi is personally responsible for returning the Tammans' monies and that the Tammans' principal is guaranteed.  <u>See</u> Trial AM Tr. at 7:17-8:7; Trial Exh. R at ¶¶ 2-3.

40. The Tammans agreed to Schinazi's proposal because Schinazi guaranteed the Tammans' principal and agreed to be responsible for returning their money.  <u>See</u> Trial AM Tr. at 7:17-8:7; Trial PM Tr. at 5:9-7:2; Trial Exh. R ¶¶ 2-3.

41. Sami Tamman trusted Schinazi because of his long-standing personal relationship with Schinazi, the leadership position held by Schinazi's family in the Jewish community of Rio de Janeiro, and the Tammans' past business dealings with Schinazi.  <u>See</u> Trial PM Tr. at 6:20-22; Trial Exh. K at 38:17-39:2; Trial Exh. K at 41:2-8; Trial Exh. K at 49:11-14.

42. Schinazi confirmed that his dealings with Sami Tamman were all based on Sami Tamman's trust of Schinazi.  <u>See</u> Trial PM Tr. at 67:16-19; Trial PM Tr. at 45:21-46:10; Trial AM Tr. at 106:23-25.

43. Sami Tamman knew Schinazi had substantial assets at this time.  <u>See</u> Trial AM Tr. at 75:18-20; Trial AM Tr. at 101:15; Trial AM Tr. at 12:25-13:6; Trial Exh. K at 53:22-54:4.

44. Tamman knew Schinazi owned a house in Mamaroneck, New York.  <u>See</u> Trial AM Tr. at 23:21; Trial AM Tr. at 74:4-13; Trial Exh. K at 7:21-8:3.

45. In 1998, Schinazi owned with his wife a residential property located at 20 Prince Willow Lane, Mamaroneck, New York.  <u>See</u> JPO Stipulated Facts ¶ 10.  Schinazi bought the property for $850,000 in 1991 and the house was sold for $1,455,000 in 2006.  <u>See</u> JPO Stipulated Facts ¶¶ 10-11.

46. Tamman knew Schinazi owned an apartment one block from the beach in Rio de Janiero.  <u>See</u> Trial AM Tr. at 74:22-25; Trial Exh. D at 85:19-86:22.

47. In 1998, Schinazi held title to an apartment one block from the beach in Rio de Janiero.  Schinazi sold that property in 2002 for approximately $480,000.  <u>See</u> JPO Stipulated Facts ¶¶ 10, 12.

48. Tamman knew Schinazi operated both a travel agency and a broker dealer out of a townhouse at 118 East 65th Street in Manhattan that Tamman believed was owned by Schinazi.  <u>See</u> Trial AM Tr. 12:25-13:6; Trial AM Tr. at 23:20-21; Trial AM Tr. at 74:4-21; Trial Exh. K at 8:5-13.

49. From 1990 and at least through 2000, Schinazi operated a travel agency, Samsky Tours & Consulting Corporation, for which he was President.  Schinazi also operated a broker dealer, Gemini Financial Corporation, for which he was Vice President and a partial owner.  Schinazi operated both businesses from a townhouse at 118 East 65th Street, New York, NY that was owned by Samsky Tours & Consulting Corporation through at least 2000.  <u>See</u> JPO Stipulated Facts ¶ 9.

**The Tammans Deposit Money into the New Account**

50. After Schinazi communicated to Sami Tamman the terms of the new account, Sami Tamman began transferring money into the new account.  <u>See</u> Trial PM Tr. at 24:13-25:6; Trial PM Tr. at 23:11-15; Trial AM Tr. at 89:11-18; Trial Exh. J at 14:19-22.

6

51. Schinazi claimed that the initial money transferred to the new account was money that had been held in the Tammans' account with Schinazi's father's currency exchange business. <u>See</u> Trial AM Tr. at 83:11-20. Despite this claim, Schinazi conceded that Sami Tamman started putting money in the new account on February 5, 1998. <u>See</u> Trial AM Tr. at 86:9-14; Trial AM Tr. 94:21-95:1.

52. Documentary evidence confirms that the initial transfers of money into the new account occurred on February 5, 1998. <u>See</u> Trial Exh. E (reflecting $0 initial balance in account on February 5, 1998 and deposit of $108,982 on February 5, 1998).

53. Schinazi's deposition testimony in 2002 and his trial testimony in 2005 in the District Court Action confirm that Sami Tamman's initial transfer of money into the new account occurred on February 5, 1998. <u>See</u> Trial Exh. C at 161:20-163:6; Trial Exh. C at 166:16-24; Trial Exh. J at 22:17-23:4; Trial Exh. J at 28:12-24.

54. Schinazi provided Sami Tamman with instructions on how to deposit money to the new account. <u>See</u> Trial Exh. H at ¶ 3 (Schinazi admits "Isaac instructed the Tammans to wire money to bank accounts over which Isaac exercised a power of attorney."); Trial Exh. J at 14:23-15:5; Trial Exh. J at 23:13-15; Trial Exh. J at 45:8-10; Trial Exh. C at 82:5-16; Trial Exh. Q at ¶ 33.

55. Schinazi instructed Sami Tamman to wire money to an account in the name of Lucky Star Financial Corporation ("Lucky Star"). <u>See</u> Trial PM Tr. at 26:13-15; Trial Exh. H at ¶ 3 (Schinazi admits "Isaac instructed the Tammans to wire money to bank accounts over which Isaac exercised a power of attorney."); Trial Exh. J at 14:23-15:5; Trial Exh. J at 23:13-15; Trial Exh. J at 45:8-10; Trial Exh. Q at ¶ 33.

56. Lucky Star is an offshore company over which Schinazi exercised a power of attorney. <u>See</u> Trial PM Tr. at 26:18-24; Trial Exh. H at ¶ 3 (Schinazi admits "Isaac instructed the Tammans to wire money to bank accounts over which Isaac exercised a power of attorney."); Trial Exh. J at 23:16-18; Trial Exh. J at 26:25-27:4; Trial Exh. J at 37:9-21; Trial Exh. Q at ¶ 34.

57. The Tammans made the following deposits to the new account by making wires to Lucky Star: (a) $108,982 on February 5, 1998; (b) $98,982 on February 6, 1998; and (c) $104,000 on March 9, 1998. <u>See</u> Trial Exh. E; Trial Exh. J at 23:19-24:6.

58. The Tammans made a $54 deposit into their new account on March 12, 1998. <u>See</u> Trial Exh. E.

59. All the monies transferred by Sami Tamman to the new account came from Sami Tamman's accounts. <u>See</u> Trial AM Tr. at 57:13-25; Trial Exh. D at 28:3-29:4. Any suggestion to the contrary is against the weight of credible evidence.

**The Receipt of Monies Received**

60. After Sami Tamman had transferred money to the new account, and about a month before May 8, 1998, Sami Tamman asked Schinazi for a receipt. <u>See</u> Trial Exh. K at 16:14-24 (Sami Tamman asked Schinazi for a receipt about "a month before" May 8, 1998); Trial Exh. K at 39:1-2 (Sami Tamman transferred money to the new account before asking Schinazi for a receipt).

61. On May 8, 1998, Schinazi prepared the Receipt of Monies Received (the "Receipt") (Trial Exh. F) and provided it to the Tammans. (The parties dispute as to whether Sami

7

62. The typewritten portion of the Receipt provides:

    Receipt is hereby acknowledged of US$318,778 as full and final payment by Sami and/or Jacqueline Tamman to be invested by Samy and Isaac Schinazi. Samy and Isaac are fully responsible for the funds. At any end of month this amount can be reimbursed on request to the owner.

    See JPO Stipulated Facts ¶ 14.

63. The $318,778 in the first sentence refers to the balance in the new account on May 8, 1998. See JPO Stipulated Facts ¶ 15.

64. The terms "the funds" and "this amount" in the second and third sentences also refer to the balance in the new account that is referenced in the first sentence. See JPO Stipulated Facts ¶ 16.

65. The terms "Samy" and "Isaac" in the second sentence refer to Schinazi and Samuele Schinazi. See JPO Stipulated Facts ¶ 17.

66. Schinazi executed and dated the Receipt on May 8, 1998 in the presence of Sami Tamman. See JPO Stipulated Facts ¶ 18.

67. The third sentence means that the Tammans can ask Schinazi for the return of their money at the end of any month. See Trial Exh. J at 6:5-15.

68. The Receipt is not only source of representations made by Schinazi to Sami Tamman about the new account; Schinazi made many oral representations to Sami Tamman. See Trial AM Tr. at 77:21-78:4; Trial Exh. J at 9:16-10:16; Trial Exh. J at 14:7-22; see also ¶¶ 18-26, infra. Any suggestion to the contrary has been rebutted by credible evidence.

**Schinazi's Intention Regarding the Receipt of Monies Received**

69. When Schinazi executed the Receipt, Schinazi was aware that the Tammans wanted Schinazi to be personally responsible for returning their money. See Trial Exh. J at 48:9-17 ("Q: Before you gave Mr. Tamman this receipt and signed it in front of him on May 8, 1998, you knew that Mr. Tamman wanted you to be responsible for his money, correct? A: Yes. That's why he put in the words in the receipt. Q: So you knew that Mr. Tamman wanted you to be responsible for the money; the receipt says the words fully responsible? A: Yes. Q: Then you signed it. A: Yes."); Trial Exh. J at 50:7-10 ("Because my father is an elderly person and Mr. Tamman did not feel comfortable that only my -- because my father invested the money and if something happened to him, he wanted me to be responsible together.").

70. When Schinazi executed the Receipt, Schinazi knew the Receipt provides that Schinazi is fully responsible for the Tammans' money. See Trial Exh. J at 46:15-17 ("Q: Before you signed it, were you aware that it had the sentence, Samy and Isaac are fully responsible for the funds? A: Yes.").

71. When Schinazi executed the Receipt, Schinazi knew the Tammans wanted Schinazi to sign the Receipt. See Trial Exh. J at 3:1-5; Trial Exh. C at 75:19-76:12.

8

72. Despite promising in the Receipt to be "fully responsible" for the Tammans' money, Schinazi never intended to be responsible for returning the Tammans' money. See Trial PM Tr. at 47:11-15; Trial PM Tr. at 27:10-24; Trial PM Tr. at 59:18-23 ("And I know the receipt says that I am fully responsible, and I know that, after two days of trial, the jury found that I was responsible, uh, at the terms that I have to pay it back. That's not what I understood. And I know the – the jury found that I was a guarantor. So, um, I never thought about that, uh, when this receipt was made."); Trial AM Tr. at 104:24-105:22; Exh. Q at ¶ 29 (admitting that Schinazi never intended to be personally responsible for returning the Tammans' monies); Trial Exh. S ¶ 10 ("I was never personally responsible for the repayment or return of the funds transferred by the Plaintiffs.").

73. Schinazi did not tell Sami Tamman what he really thought when he signed the Receipt, i.e., that he did not intend be personally responsible for returning the Tammans' money. See Trial Exh. J at 47:15-48:8.

### The Tammans Deposit More Money into the New Account

74. Following Isaac Schinazi's instructions, the Tammans made the following deposits to the new account by making wires to Lucky Star: (a) $519,982 on September 8, 1998; and (b) $17,975 March 16, 1999. See Trial PM Tr. at 32:20-33:2; Trial Exh. E.

75. Schinazi also instructed Sami Tamman to wire money to an account in the name of Mabruk Financial Corp. ("Mabruk"). See Trial PM Tr. at 25:25-26:15; Trial PM Tr. at 32:20-33:2; Trial Exh. H at ¶ 3 (Schinazi admits "Isaac instructed the Tammans to wire money to bank accounts over which Isaac exercised a power of attorney."); Trial Exh. J at 14:23-15:5; Trial Exh. J at 45:8-10; Trial Exh. C at 82:5-21; Trial Exh. Q at ¶ 33.

76. Like Lucky Star, Mabruk is an offshore company over which Isaac Schinazi exercised a power of attorney. See Trial PM Tr. at 26:13-24; Trial Exh. H at ¶ 3 (Schinazi admits "Isaac instructed the Tammans to wire money to bank accounts over which Isaac exercised a power of attorney."); Trial Exh. J at 26:17-27:4; Trial Exh. J at 36:15-37:15; Trial Exh. Q at ¶ 34.

77. Following Isaac Schinazi's instructions, the Tammans made the following deposits to the new account by making wires to Mabruk: (a) $500 on February 24, 1999; and (b) $88,175 on March 4, 1999. See Trial Exh. E.

78. Sami Tamman's father-in-law Horesh made a $7,000 deposit into the Tammans' new account on August 5, 1999. See Trial Exh. E.

### Schinazi Updates the Receipt of Monies Received

79. At a post-Bar Mitzvah brunch hosted by Schinazi in March, 2000, Sami Tamman asked Schinazi to update the balance on the Receipt. See JPO Stipulated Facts ¶ 19.

80. Schinazi agreed and made the following handwritten notation to the Receipt:

    Updated on 3/14/00 to $1.400.000,00 approximately.

    See JPO Stipulated Facts ¶ 20.

81. The reason why Schinazi wrote "$1.400.000.00 approximately" is because Schinazi did not know that exact balance in the Tammans' account but he knew it was approximately $1.4 million. See Trial PM Tr. at 49:6-8.

9

82. Schinazi's handwritten notation updated the balance of the monies in the new account, which was approximately $1,400,000 at that time. See JPO Stipulated Facts ¶ 21.

83. Schinazi signed and dated the Receipt after he made the handwritten notation. See JPO Stipulated Facts ¶ 22.

### Schinazi's Intention When Updating the Receipt of Monies Received

84. When Schinazi updated the Receipt, Schinazi understood Sami Tamman wanted Schinazi to be responsible for returning the Tammans' monies. See Trial PM Tr. at 31:15-20.

85. When Schinazi updated the Receipt, Schinazi did not intend to be personally responsible for returning to the Tammans the updated amount: the "$1.400.000.00 approximately." See Trial PM Tr. at 44:11-45:13; Trial Exh. S ¶ 10 ("I was never personally responsible for the repayment or return of the funds transferred by the Plaintiffs.").

### The Statement of Account

86. The statement of account (Trial Exh. E) reflects the historical activity and balance in the new account. See JPO Stipulated Facts ¶ 23.

87. The statement of account is a print out of a computer file that was created at the direction of Schinazi and/or his father after the Tammans' first wire transfer. See JPO Stipulated Facts ¶ 24.

88. After each transaction, persons acting under the direction of Schinazi and/or his father updated the computer file by adding two entries: an entry reflecting the new transaction and an entry reflecting the new balance. See JPO Stipulated Facts ¶ 25.

89. Schinazi supplied the information to update the computer file to reflect the wire deposits in the new account. See JPO Stipulated Facts ¶ 26.

90. Schinazi transmitted the statement of account to Sami Tamman more than once. See JPO Stipulated Facts ¶ 27; Trial PM Tr. at 50:18-21; Trial PM Tr. at 32:10-19.

91. The statement of account was produced by Schinazi in the District Court Action. See JPO Stipulated Facts ¶ 28.

92. The last balance reflected by the statement of account is $1,389,327 on June 9, 2000. See JPO Stipulated Facts ¶ 29.

93. Schinazi admits that the $1,389,327 reflected on the statement of account was the amount owed to Sami Tamman. See Trial PM Tr. at 41:25-42:4.

94. The money deposited into the Tammans account was the Tammans' money. See Trial AM Tr. at 115:11-15 ("I believe it was his [Sami Tamman's] money."); Trial AM Tr. at 117:3-9 (Schinazi agrees the money in the new account was Sami Tamman's money); Trial AM Tr. at 112:20-23 ("It's Sami Tamman's money"); Trial AM Tr. at 110:2-4 (Schinazi understood that Sami Tamman transferred money to the new account); Trial Exh. D at 28:3-29:4.

### The Tammans Demand for the Return of their Money

95.  The Tammans asked Schinazi to return their money in the summer of 2000.  See JPO Stipulated Facts ¶ 30.

96.  No monies were returned to the Tammans.  See JPO Stipulated Facts ¶ 31.

### The District Court Action

97.  When no monies were returned to the Tammans following their demand to Schinazi, the Tammans sued Schinazi in the District Court Action for breach of contract.  See JPO Stipulated Facts ¶ 32.

98.  Schinazi claimed in the District Court Action that he never intended for the Tammans' principal to be guaranteed because, in his view, the Tammans bore the entire risk for losses on investments made with the Tammans' money.  See Trial Exh. J at 10:25-11:3; Trial Exh. J at 69:11-15; Trial Exh. J at 73:9-12; Trial Exh. J at 77:4-7; Trial Exh. O at 1; Trial Exh. H at ¶ 14; Trial Exh. W at 6 (response to Interrogatory No. 9).

99.  Schinazi claimed in the District Court Action that the Tammans' investments were worth nothing at the time the Tammans asked for the return of their money.  See Trial Exh. J at 77:4-7; Trial Exh. C at 249:14-25.

100. Schinazi claimed in the District Court Action that he never intended to be personally responsible for returning the Tammans' monies, as he always viewed himself as a middleman to a contract between the Tammans and Samuele Schinazi.  See Trial Exh. J at 44:19-21; Trial Exh. J at 45:17-19; Trial Exh. C at 96:25-98:4; Trial Exh. C at 100:25-101:25; Trial Exh. C at 105:25-106:6; Trial Exh. C at 117:15-23; Trial Exh. O at 1, 2, 4; Trial Exh. H at ¶¶ 2-4, 16, 19-20 & at 3; Trial Exh. S at ¶ 6.

101. On the third and final day of the trial, the Honorable George B. Daniels charged the jury on the Tammans' breach of contract claim.  See JPO Stipulated Facts ¶ 33.

102. Part of the instruction that the District Court gave to the jury, for purposes of determining whether Schinazi and the Tammans had entered into a contract pursuant to which Schinazi obligated himself to repay the amounts transferred by the Tammans, is as follows:

   Now, plaintiffs Sammi (sic) and Jacqueline Tamman seek to recover damages for breach of contract.  Plaintiffs claim that defendant, Isaac Schinazi, breached the contract by failing to return the moneys (sic) loaned by plaintiffs to defendant and his father.  The burden is on plaintiffs to prove that they gave the monies to the defendant and his father in reliance on a promise by defendant that he would return the monies upon request to the plaintiffs. . . . To find such a promise, you must find that defendant in express language said that if plaintiffs loan defendant and his father the monies, he would be obligated to return the monies to plaintiff, or before plaintiffs loaned defendant and his father money, plaintiffs made clear to defendant that if plaintiffs loaned the money to defendant and his father, the defendant would be expected to return the monies to plaintiffs and the defendant thereafter, by accepting the monies, acted in such way that demonstrated such an agreement.  See JPO Stipulated Facts ¶ 34 (emphasis added).

103. The jury returned a unanimous verdict in favor of the Tammans.  See JPO Stipulated Facts ¶ 35.

11

104. The jury found that Schinazi entered into a contract with the Tammans. <u>See</u> JPO Stipulated Facts ¶ 36.

105. The jury found that the contract obligated Schinazi to return the monies transferred by the Tammans, plus interest. <u>See</u> JPO Stipulated Facts ¶ 37.

106. The jury found that Schinazi breached the contract by failing to return the Tammans' monies. <u>See</u> JPO Stipulated Facts ¶ 38.

107. The jury found that Schinazi's breach of contract caused the Tammans to sustain damages in the amount of $1,799,327. <u>See</u> JPO Stipulated Facts ¶ 39.

108. The jury's verdict substantially exceeded the damages requested by the Tammans, i.e., the $1,389,327 final balance on the statement of account. <u>See</u> JPO Stipulated Facts ¶ 40.

109. The District Court entered judgment for $1,389,327, with prejudgment interest from July 1, 2000. <u>See</u> JPO Stipulated Facts ¶ 41.

110. A necessary predicate to the jury's findings that is that Schinazi, through his words or conduct, made clear to the Tammans that he agreed to return their monies upon demand. <u>See</u> Trial Exh. H at ¶ 58 (Schinazi admits "A necessary predicate to the jury's findings is that the Debtor promised the Tammans that the Debtor is personally responsible for returning the Tammans' monies."); compare JPO Stipulated Facts ¶ 34; with JPO Stipulated Facts ¶¶ 38-39; <u>see also</u> Trial AM Tr. at 130:5-8 ("Q: And what did the jury understand? A: The jury understood that I signed that document that means that I guaranteed, uh, the, the funds. And that, -- and I was responsible for the funds after that fact.").

**Schinazi Lacked Credibility at Trial**

111. Schinazi's trial testimony was often evasive, incoherent and self-serving, with Schinazi providing long-winded non-responsive answers. E.g., Trial AM Tr. at 105:7-107:12; Trial AM Tr. at 90:17-91:16; Trial AM Tr. at 96:18-98:18; Trial AM Tr. at 101:4-102:10; Trial AM Tr. at 108:15-23; Trial AM Tr. at 109:20-110:17; Trial PM Tr. at 30:11-17; Trial PM Tr. at 36:7-23;

112. Schinazi gave contradictory testimony at the November 15, 2010 trial in this action:

   a. Schinazi claimed that he did not know who wired money into the Tammans' account or even whose money it was. <u>See</u> Trial AM Tr. at 95:15-21; Trial AM Tr. at 98:16-17. Schinazi then conceded that before each transfer of money into the new account, Sami Tamman told Schinazi that a precise amount of money would be wired. <u>See</u> Trial AM Tr. at 95:18-24; Trial AM Tr. at 98:19-20. Schinazi also conceded that the money came from Sami Tamman and that he believed the money was Sami Tamman's money. <u>See</u> Trial AM Tr. at 115:11-15 ("I believe it was his [Sami Tamman's] money."); Trial AM Tr. at 117:3-9 (Schinazi agrees the money in the new account was Sami Tamman's money); Trial AM Tr. at 112:20-23 ("It's Sami Tamman's money"); Trial AM Tr. at 110:2-4 (Schinazi understood that it was Sami Tamman who transferred money to the new account).

   b. Schinazi claimed that he received no compensation for his dealings with Sami Tamman in connection his father's currency exchange business. <u>See</u>

12

        Trial PM Tr. at 53:4-7 (Schinazi "never got a salary" while working in Brazil for his father's currency exchange business); Trial PM Tr. at 60:24-61:1 (Schinazi "never got a commission on anything" while performing services for his father's currency exchange business after he moved to New York). Schinazi then conceded he received substantial monies from his father. See Trial PM Tr. at 61:24-62:1 ("Well, whenever my father -- uh, whenever – if I needed money for something, my father would help me out."). Schinazi's father paid Schinazi's "expenses" during the time Schinazi worked in Brazil for his father's currency exchange business from 1982 through 1990. See Trial PM Tr. at 53:4-7 (Schinazi testified that his "father would pay my – my – my bills and everything" while he was working in Brazil for his father's currency exchange business). Thereafter, Schinazi's father provided financial support to Schinazi: Schinazi's father paid some of Schinazi's bills, Schinazi's father provided Schinazi with the $200,000 down payment for the purchase of house in Mamaroneck, and Schinazi's father provided Schinazi with about $30,000 a year. See Trial PM Tr. at 62:1-9 (Schinazi testifies that his father gave him $200,000 to buy his house in Mamaroneck); Trial PM Tr. at 62:10-20 (Schinazi testified that in the late 1990's and early 2000's, "he [his father] would help me . . . And so I needed to pay expenses, I would ask my father, he would help me."); Trial PM 63:13-64:2 (Schinazi admits his father provided him with about $30,000 a year).

c.    Schinazi claimed that he did not describe the terms of the new account to Sami Tamman before Sami Tamman started transferring money into the new account. See Trial AM Tr. at 86:15-21; Trial AM Tr. at 87:4-8. Indeed, Schinazi went so far as to claim that he did not ask Sami Tamman if he would like to earn interest on his money until three months after the money had been sitting in the new account. See Trial AM Tr. at 86:23-87:3. After Schinazi was confronted with his contradictory trial testimony in the District Court Action, see Trial AM Tr. at 87:15-88:19, Schinazi conceded he must have described the terms of the new account before Sami Tamman starting putting money into the new account. See AM Tr. at 89:11-16 ("Q: So, before the Tammans started putting money into this account, you did not describe the terms of the account? A: No, before he transferred the money to – before he decided to invest the money, yes, I must have, uh, proposed something to him . . .").

d.    Schinazi denied that he intended to induce Sami Tamman to agree to the new account. See Trial AM Tr. at 94:4-16. Schinazi later admitted that he was trying to encourage Sami Tamman to agree to the new account, which he conceded is not much different from trying to induce Sami Tamman. See Trial AM Tr. at 99:14-100:11.

e.    Schinazi claimed that the only representations he made to Sami Tamman were those written in the Receipt. See Trial AM Tr. at 125:23-126:2; Trial AM Tr. at 127:10-16. Schinazi also claimed he was not sure if he had made any oral representations. See Trial AM Tr. at 127:17-22; Trial AM Tr. at 102:19-103:3. Schinazi, however, conceded that he must have made oral representations to Sami Tamman apart from the Receipt. See AM Tr. at 89:11-16 ("Q: So, before the Tammans started putting money into this account, you did not describe the terms of the account? A: No, before he transferred the money to – before he decided to invest the money, yes, I must have, uh, proposed something to him . . .").

13

113. Schinazi gave testimony at trial that contradicted the affidavit he submitted to the Court in opposition to the Tammans' motion for summary judgment.

    a. Schinazi claimed that he never thought about whether he was personally responsible for returning the Tammans' money. See Trial AM Tr. at 103:4-11 ("It never crossed my mind"; "I never thought about it"); Trial AM Tr. at 104:24-106:14 ("I never thought about that"; "I never thought about the any problem of losing money"). Schinazi's after-the-fact claim contradicts his affidavit statement attesting that in his "understanding of things," he "was never personally responsible for the repayment or return of the funds transferred by the Plaintiffs." Exh. S at ¶ 10.

114. Schinazi gave testimony at trial that contradicted his trial and deposition testimony in the District Court Action, his sworn interrogatory answers in the District Court Action, and the statements admitted by Schinazi in the Rule 56.1 statement he submitted in the District Court Action:

    a. Schinazi claimed at the November 15 trial that the judgment issued in the District Court Action did not concern an account into which Sami Tamman put money beginning in February, 1998. See Trial AM Tr. at 83:11-20. Schinazi's testimony contradicts his trial testimony from 2005, where Schinazi conceded that the District Court Action concerned an account into which the Tammans put money beginning in February, 1998. See Trial Exh. J at 9:13-15 (Schinazi agrees that the lawsuit concern account into which the Tammans put money); Trial Exh. J at 22:23-23:4 (Schinazi claims that the February 5, 1998 transfer of $108,982 was "the first amount that Mr. Tamman sent to be invested").

    b. Schinazi claimed at the November 15 trial that the Tammans' money in the new account would be invested only by Schinazi's father and not also by Schinazi too. See Trial AM Tr. at 90:4-6; Trial AM Tr. 91:17-20. Schinazi's testimony contradicts his trial testimony from 2005, where Schinazi conceded that both he and his father would invest the Tammans' money. See Trial Exh. J at 10:8-11; Trial Exh. J at 14:11-12.

    c. Schinazi claimed at the November 15 trial that he did not make any representations to Sami Tamman regarding the new account until May, 1998, three months after Sami Tamman began putting money into the new account. See Trial AM Tr. at 126:18-127:22. Schinazi's testimony contradicts his trial testimony from 2005, where Schinazi conceded that he told Sami Tamman the terms of the new account before Sami Tamman began to put money into the new account in February, 1998, which is several months before Schinazi executed the Receipt in May, 1998. See Trial Exh. J at 66:4-67:13; Trial Exh. J at 69:23-70.3; Trial Exh. J at 9:16-10:16; Trial Exh. J at 13:16-14:22.

    d. Schinazi claimed at the November 15 trial that the Tammans did not bear the risk for losses on investments made with the Tammans' money. See Trial AM Tr. at 122:15-20; Trial AM Tr. at 123:24-124:1. Schinazi's testimony contradicts Schinazi's trial testimony and interrogatory answers in the District Court Action where Schinazi claimed that the Tammans bore responsibility for losses on investments made with the Tammans' money. See Trial Exh. W at 6, response to Interrogatory No. 9; Trial Exh. J at 10:20-11:3.

14

      e.    Schinazi claimed at the November 15 trial that he never thought about whether the Tammans' principal was guaranteed. See Trial AM Tr. at 119:16-120:3. Schinazi's testimony contradicts the statement admitted by Schinazi in the District Court Action that he "told the Tammans that (i) their principal would be guaranteed." See Trial Exh. H at ¶ 2(i).

      f.    Schinazi claimed at the November 15 trial that he did not know that Sami Tamman wanted him to be personally responsible for returning the Tammans' money when, in May, 1998, he signed the Receipt which provides that he is "fully responsible" for the Tammans' money. See Trial PM Tr. at 27:10-28:13. Schinazi's incredulous testimony contradicts his trial testimony from 2005, where Schinazi conceded he knew Sami Tamman wanted him to be responsible for returning the Tammans' money when he signed the Receipt in 1998. See Trial Exh. J at 48:9-17.

## CONCLUSIONS OF LAW

### Jurisdiction and Venue

115.    This adversary proceeding arises under section 523(a)(2)(A) of the Code and was brought pursuant to Rules 4007 and 7001 of the Federal Rules of Bankruptcy Procedure.

116.    The Debtor's chapter 7 case, case no. 06-10226 (BRL), is now pending in this Court. Thus, this Court has jurisdiction pursuant to 28 U.S.C. sections 1334 and 157, and section 523 of the Code.

117.    Venue in this district is proper pursuant to 28 U.S.C. sections 1408 and 1409.

118.    This is a core proceeding under 28 U.S.C. section 157(b)(2)(I).

119.    There is no dispute among the parties concerning jurisdiction or venue.

### Non-Dischargeability of Debts

120.    An exception to discharge under § 523(a)(2)(A)[1] is construed by the common law[2] and is established by a showing of the following five elements: (1) the debtor made a representation; (2) the debtor knew the representation was false at the time it was made; (3) the representation was made with the intent to deceive the creditor; (4) the creditor relied on the representation; and (5) the creditor was injured by the representation and suffered damages as a result.[3]

---

[1] "A discharge . . . does not discharge an individual debtor from any debt -- . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by -- (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . ." 11 U.S.C. § 523(a).

[2] See Field v. Mans, 516 U.S. 59, 70 (1995); Weiss v. Alicea (In re Alicea), 230 B.R. 492, 500 (Bankr. S.D.N.Y. 1999).

[3] Kuper v. Spar (In re Spar), 176 B.R. 321, 326 (Bankr. S.D.N.Y. 1994).

Determination of non-dischargeability under section 523(a)(2)(A) must take into account the two competing objectives of bankruptcy: (1) to provide an honest and deserving debtor with a fresh start; and (2) to prevent a dishonest debtor from using the bankruptcy code to shield his wronging. *See id.*

15

121. A creditor's burden for establishing an exception to discharge under § 523(a)(2)(A) is the preponderance of the evidence.[4]

### Schinazi's Representations

122. The preponderance of the evidence adduced at trial establishes that Schinazi made two representations to Sami Tamman:  (i) Schinazi would be personally responsible for returning the Tammans' monies; and (ii) the Tammans' principal is guaranteed.[5]

### Schinazi's Knew His Representations Were False

123. A misrepresentation is fraudulent if the maker "knows or believes that the matter is not as he represents it to be."[6]  A fraudulent misrepresentation may be predicated upon the debtor's misrepresentation of intention,[7] including the intention to return monies.[8]  The focus is on the debtor's state of mind at the time he made the representation,[9] and the debtor's intent may be inferred from the totality of the circumstances.[10]

124. The preponderance of the evidence adduced at trial also establishes that Schinazi knew that both of the representations he made to Sami Tamman were false at the times he made them.  Ample evidence, including Schinazi's own admissions and testimony, shows that

---

[4] *See Grogan v. Garner*, 498 U.S. 279 (1991).

[5] Similar representations have served as the basis for non-discharge determinations where the other elements of § 523(a)(2)(A) claim are met. *E.g.*, *Hong Kong Deposit & Guar. Co. v. Shaheen (In re Shaheen)*, 111 B.R. 48 (S.D.N.Y. 1990) (affirming bankruptcy court's order declaring debt nondischargeable where debtor misrepresented that he would repay loan); *Weiss v. Alicea (In re Alicea)*, 230 B.R. at 504 ("[A] guarantee is like any other promise to perform in the future, and may support a fraud claim if the promisor did not intend to honor the guarantee when he made it.").

[6] *Weiss v. Alicea (In re Alicea)*, 230 B.R. at 500 (quoting RESTATEMENT (SECOND) OF TORTS § 526).

[7] *See Kuper v. Spar (In re Spar)*, 176 B.R. at 327 ("When, at the time a representation is made, the debtor has no intention of performing as promised, a debtor's misrepresentation of his intentions will constitute a false representation under Code § 523(a)(2)(A)."); *Weiss v. Alicea (In re Alicea)*, 230 B.R. at 501 ("[F]raud may lie for a misstatement of intention.  'A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention.'") (quoting RESTATEMENT (SECOND) OF TORTS § 530(1)); *cf. Maloul v. Berkowitz*, No. 07-CIV-8525, 2008 WL 2876532, at *2 (S.D.N.Y. July 23, 2008) ("'[I]t is settled [under New York law] that, *if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of material existing fact* upon which an action for rescission [based on fraudulent inducement] may be predicated.'") (quoting *Century Pac. Inc. v. Hilton Hotels Corp.*, No. 03-CIV-8258, 2004 WL 868211, at * 7 (S.D.N.Y. Apr. 20, 2004); emphasis and second alteration in original).

[8] *See Mfrs. Hanover Trust Co. v. Pannell (In re Pannell)*, 27 B.R. 298, 302 (Bankr. E.D.N.Y. 1983) ("If it can be established that, in fact, at the time the debt was incurred, there was no intent to pay, then all the elements of fraud are present.").

[9] *See Gomez-Cuevas v. Barrios (In re Barrios)*, A.P. No. 06-01909, 2007 WL 2406881, at *3 (Bankr. S.D.N.Y. Aug. 20, 2007) (Lifland, J.) ("If the Debtor had no intention of performing the obligations under the contract when he entered into the agreement, the debt is non-dischargeable."); *Bank of Am. v. Jarczyk*, 268 B.R. 17, 23 (W.D.N.Y. 2001) ("[T]he focus is on Jarczyk's subjective state of mind at the time the representation was made, and not on whether that representation was objectively reasonable.").

[10] *See Kuper v. Spar (In re Spar)*, 176 B.R. at 328 ("The scienter element of a Code § 523(a)(2)(A) claim can be inferred from the totality of the circumstances because direct proof of a debtor's state of mind is generally not available.").

16

        Schinazi never intended at any time to be personally responsible for returning the Tammans' money or for the Tammans' principal to be guaranteed.

125.    Schinazi's knowledge of the falsity of his representations to Sami Tamman is not negated by Schinazi's testimony at trial that he never thought about whether he was personally responsible for returning the Tammans' money. This testimony by Schinazi is simply not believable in light of the evidence adduced at trial, including Schinazi's prior testimony in the District Court Action. Moreover, Schinazi was not a credible witness.

### Schinazi's Intent To Deceive

126.    "Intent to deceive will be inferred where a debtor makes a false representation and the debtor knows or should know that the statement will induce another to act."[11] "[A]n intent to deceive can be logically inferred from a defendant's false representations which the debtor knows will induce another to make a loan."[12]

127.    The preponderance of the evidence adduced at trial establishes that Schinazi knew that his representations would induce Sami Tamman to transfer monies to the new account. Indeed, Schinazi admits he was trying to encourage Sami Tamman to transfer monies to the new account, and he knew that these representations were important to Sami Tamman.

### The Tammans' Reliance

128.    Section 523(a)(2)(A) "requires justifiable, but not reasonable, reliance" by the creditor on the debtor's misrepresentation.[13] Where, as here, the representation concerns a debtor's intention to fulfill his promise to pay monies, a creditor's reliance on such representation is justifiable where the represented intention is material to the creditor and the creditor has reason to believe that the debtor will carry out his represented intention.[14] A representation of intention is material where a reasonable creditor would attach importance to it or the debtor knows or has reason to know that the creditor is likely to regard the representation as important.[15] A creditor has reason to believe that the debtor's representation of his intention will be carried out so long as the creditor is not already

---

[11] *F.T.C. v. Duggan (In re Duggan)*, 169 B.R. 318, 324 (Bankr. E.D.N.Y. 1994).

[12] *Hong Kong Deposit & Guar. Co. v. Shaheen (In re Shaheen)*, 111 B.R. at 53.

[13] *Field v. Mans*, 516 U.S. at 74-75; *see also Lance v. Tillman (In re Tillman)*, 197 B.R. 165, 168 (Bankr. D.D.C. 1996) ("In *Field*, the Court held that the proper level of reliance necessary under § 523(a)(2)(A) is justifiable, rejecting the higher standard of reasonable or no qualifying standard.").

[14] *See AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 416 (5th Cir. 2001) ("Concerning *justifiable reliance*, the Restatement has a special rule for representations of *intention*, as at issue here. Reliance is *justifiable* 'if the *existence* of the intention is *material* and the recipient has *reason to believe* that it will be carried out.'") (quoting RESTATEMENT (SECOND) OF TORTS § 544; emphasis in original).

[15] *See id*. ("For the existence of the intention being *material*, [of the RESTATEMENT (SECOND) OF TORTS] § 544's commentary contains a cross-reference to § 538(2), which defines materiality. It is present when, in deciding on a course of action, 'a *reasonable* man would *attach importance* to its existence' or 'the maker of the representation knows *or has reason to know* . . . its recipient regards or is likely to regard the matter as important . . . , *although a reasonable man would not so regard it*.'") (quoting RESTATEMENT (SECOND) OF TORTS § 538(2); emphasis in original; omissions in original; citations omitted); *Lance v. Tillman (In re Tillman)*, 197 B.R. at 169 ("A misrepresentation is material if it would be important to the reasonable man or would be important to the plaintiff for a particular reason known to the debtor.").

17

aware of facts making it impossible for the debtor to carry out his stated intention.[16] Reliance "is therefore 'a low hurdle for the creditor to meet, and it is intended as an obstacle only for creditors acting in bad faith.'"[17] Evidence of a long-standing friendship or familial relationship weighs in favor of finding justifiable reliance.[18]

129. The preponderance of the evidence adduced at trial establishes that the Tammans' reliance on Schinazi's two representations was justifiable. A reasonable creditor would attach importance to representations that his monies will be returned and that his principal is guaranteed. There is reliance in fact as the Tammans attached importance to Schinazi's promises that he is personally responsible for returning the Tammans' money, and that the Tammans' principal is guaranteed. Moreover, the Tammans' reliance is further established by the familial relationship and the long-standing friendship between Schinazi and Sami Tamman. It is undisputed that Sami Tamman trusted Schinazi. Schinazi admitted that he operated by relying on the complete trust of others. The record also established the Sami Tamman believed Schinazi had ample assets making it possible for Schinazi to return the Tammans' money.

### The Tammans' Injury

130. The District Court Action determined that the Tammans were injured by Schinazi in the transaction at issue. The Tammans' judgment debt constitutes the principal advanced by the Tammans, interest on the principal, prejudgment interest from the accrual date of the Tammans' claim until entry of the judgment in favor of the Tammans, and postjudgment interest from the entry of the judgment until Schinazi's bankruptcy filing.

131. The entirety of the Tammans' judgment debt arose from Schinazi's fraud and, therefore, is nondischargeable.[19]

---

[16] *See In re Esposito*, 44 B.R. at 825 ("'The creditor need establish only its reliance in fact, although its claims to reliance cannot be so unreasonable as to defeat a finding of reliance in fact.'") (quoting *In re Garman*, 643 F.2d 1252 (7th Cir. 1980)); *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d at 417, 423 ("If the recipient *'knows facts* that will make it *impossible* for the maker to [carry out his intention, the recipient] *cannot be justified* in his reliance."; "For justifiable reliance, the focus should be on whether UCS, based on its credit screening and its relationship with Mercer during her brief card-use, had reason to believe she would *not* carry out her representation, through card-use, of intent to pay.") (citing RESTATEMENT (SECOND) OF TORTS § 544 cmt c; emphasis and alteration in original).

[17] *Nat'l Union Fire Ins. Co. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 305 (2d Cir. 1996) (quoting *In re Shaheen*, 111 B.R. 48, 53 (S.D.N.Y. 1990)).

[18] *See Kuper v. Spar (In re Spar)*, 176 B.R. at 328 ("A long standing friendship or close personal relationship weighs heavily in favor of finding reasonable reliance."); *Montalto v. Sobel (In re Sobel)*, 37 B.R. 780, 785 (Bankr. E.D.N.Y. 1984) ("Because of the relationship of trust and confidence which had been built up between the younger people and the Sobels, it was easy for the former to credit Sobel's explanation. . . . They are not to be faulted if they believed that their close friends and the godparents of one of their children would deal honestly with them."); *Lance v. Tillman (In re Tillman)*, 197 B.R. at 171 ("[T]here are numerous cases finding that evidence of friendship or a close personal relationship weighs heavily in favor of finding at least justifiable reliance if not the higher level of reasonable reliance. The courts reason that creditors are not to be faulted for relying on the honesty of close friends who take advantage of them.").

[19] *See Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998) (noting that all debt arising from fraud -- "including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor" -- is nondischargeable under § 523(a)(2)(A)); *Hong Kong Deposit & Guar. Co. v. Shaheen (In re Shaheen)*, 111 B.R. at 53 (affirming Bankruptcy Court order declaring debt nondischargeable where debt comprised principal on loans and interest

132. The evidence adduced at trial establishes all the elements for non-discharge under 11 U.S.C. § 523(a)(2)(A). Moreover, the collateral estoppel effect of the District Court Action also supports to these findings.

133. "'[T]he doctrine of collateral estoppel may be invoked to bar relitigation of the factual issues underlying the determination of dischargeability.'"[20] "The Second Circuit utilizes a two-tiered test in determining whether collateral estoppel is applicable: (1) The issues in the two proceedings must be identical; and (2) The party sought to be estopped must have had a full and fair opportunity to contest the prior determination."[21] The party seeking to establish facts by collateral estoppel "has the burden of introducing 'a record sufficient to reveal the controlling facts and pinpoint the exact issues litigated in the prior action.'"[22]

134. Here, collateral estoppel effect of the judgment in the District Court Action establishes that the following facts were necessarily determined in the District Court Action:

    (a) Schinazi entered into a contract with the Tammans;

    (b) Schinazi, by his words or conduct, agreed that he is personally responsible for returning the Tammans' monies upon demand;

    (c) Schinazi, by his words or conduct, agreed that the Tammans' principal is guaranteed as he and/or his father bore the risk for any losses on investments they made with the Tammans' monies;

    (d) the Tammans transferred monies to Schinazi pursuant to the contract;

    (e) the Tammans demanded Schinazi to return their monies;

    (f) Schinazi breached his promise by failing to return the Tammans' monies; and

    (g) the Tammans were injured in the amount of $1,389,327.

135. The foregoing facts established by the collateral estoppel effect of the District Court Action demonstrate the following elements of the Tammans 523(a)(2)(A) claim in this action:

    (a) Schinazi, by his words or conduct, agreed that he is personally responsible for returning the Tammans' monies upon demand;

---

accruing thereon); *Bender v. Tobman (In re Tobman)*, 96 B.R. at 439, 440 ("[T]his Court holds that both the punitive damages and the Judgment for accrued interest are likewise nondischargeable. . . . In this case, both punitive damages and compensatory damages flow from one and the same course of conduct. . . . [T]he determination that interest as allowed in the judgment of a prior court action is nondischargeable along with the principal debt owed is not without precedent within this District.") (citations omitted).

[20] *Bender v. Tobman (In re Tobman)*, 96 B.R. at 435 (quoting *In re Stone*, 90 B.R. 71, 75 (Bankr. S.D.N.Y. 1988)); *Cooper v. Zois (In re Zois)*, 269 B.R. at 97 ("It is well settled that collateral estoppel may be used in dischargeability actions where there has been a prior decision.").

[21] *Metromedia Co. v. Fugazy (In re Fugazy)*, 157 B.R. at 765.

[22] *Bender v. Tobman (In re Tobman)*, 96 B.R. at 434 (quoting *In re Spector*, 22 B.R. 226, 231 (Bankr. N.D.N.Y. 1982)).

19

    (b)    Schinazi, by his words or conduct, agreed that the Tammans' principal is guaranteed as he and/or his father bore the risk for any losses on investments they made with the Tammans' monies;

    (c)    the Tammans relied on Schinazi's promises when transferring monies to the new account; and

    (d)    the Tammans were injured in the amount of $1,389,327 as a result of Schinazi's conduct.

## **CONCLUSION**

136.    For the foregoing reasons, this Court finds that judgment should be entered that the entirety of Schinazi's judgment debt to the Tammans is non-dischargeable pursuant to section 523(a)(2)(A) of the Code.

Dated: New York, New York
        February 23, 2010

                                                /s/ Burton R. Lifland
                                                United States Bankruptcy Judge